Paul **PHELPS**, Plaintiff,

v.

Wayne **DUNN**, et al., Defendants.

**Civ. A. No. 87–389.**

United States District Court,
E.D. Kentucky,
at Lexington.

June 24, 1991.

Douglas L. McSwain, Ogden Sturgill & Welch, Lexington, Ky., for plaintiff.

Barbara W. Jones, Corrections Cabinet, Office of General Counsel, Frankfort, Ky., for defendants.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

This matter is currently before the Court upon the motion of the defendants, Wayne Dunn and Clark Edwards for summary judgment. Also before the Court is the plaintiff's motion for pre-trial conference and to set a trial date. The plaintiff, Paul Phelps, is an individual who, at the time of submitting his *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983, was confined at the Northpoint Training Center (NTC) in Burgin, Kentucky. Consistent with local practice, this matter was referred to the United States Magistrate for initial consideration and, later, for further development of the record. Counsel was appointed to represent the plaintiff and discovery was taken. In response to the defendants' motion for summary judgment, the plaintiff has filed a response. The Magistrate filed a report and recommendation in which he recommended that the defendants' motion be sustained and this action be stricken from the docket. The plaintiff has filed objections to the Magistrate's report.

By plaintiff's complaint, amended complaint and most recent allegations of constitutional violations contained in his response to the pending motion,[1] plaintiff asserts that he was denied his right to actively participate in religious services at the institution. He claims that his rights under the Free Exercise Clause of the First Amendment of the United States Constitution as well as the Establishment Clause have been violated. Not only has the plaintiff's religious expression been discriminated against unreasonably in violation of the Free Exercise Clause, but also his particular religious beliefs have been impermissibly considered by the defendants in their decision to curtail and deny plaintiff's right to equal participation in religious services, in violation of the Establishment Clause. The plaintiff also presents a claim under the Equal Protection Clause of the Fifth Amendment due to defendants' allowance of other inmates similarly situated to have greater rights of participation in religious services than he, and without any basis for this distinction that is rationally connected to a legitimate penological interest. Finally, the plaintiff claims a procedural due process violation under the Fourteenth Amendment based upon his contention that although he won his grievance in the internal prison grievance system about the religious expression over which he now sues, defendants effected a change in prison policy that undermined the plaintiff's favorable grievance result.

The facts can be summarized as follows. From 1985 through most of 1986, the plaintiff was permitted by the chaplain, Willie C. Polk, Jr., to actively participate in chapel services, which were held daily. Plaintiff sang in the choir, sang solos, read aloud from the Bible and shared his testimony of

---

1. Current counsel for the plaintiff entered his appearance for the record on February 21, 1990, more than two years after the original complaint was filed *pro se*. Having expressed his identification of additional constitutional issues, counsel requested leave to amend the complaint as necessary. Both the Magistrate and the undersigned have considered all of the allegations for the purposes of the motion for summary judgment. In view of the disposition of this case, filing an amended complaint will not be required.

faith. The chaplain believed in equal participation for all, despite the plaintiff's professed homosexuality and despite other inmates' objections to the active participation of a practicing homosexual. In February 1986, the defendant Edwards, as volunteer chaplain, began to conduct services on Tuesday and Wednesday of each week. Defendant and the plaintiff disagreed upon the proper role for a gay Christian in services. Chaplain Edwards believed that active participation, by singing solos and giving testimony, etc., by a homosexual was inconsistent with his interpretation of the Bible. The plaintiff contends that the defendant refused to allow him to actively participate in services as other inmates were allowed to during and after August 1986, when Edwards filled in for Chaplain Polk while he was on vacation.[2] Plaintiff alleges that defendant Dunn began to take sides with defendant Edwards. He states that at one point he was barred from chapel under threat of "lock-up" by Deputy Dunn.

Also in the record is testimony by sworn statements that during this time two discernable factions among the chapel attenders developed. Plaintiff belonged to, or possibly led, a group of practicing homosexual Christians, who were opposed by a group of anti-gay Christians. Tensions mounted throughout the fall of 1986.

Plaintiff filed an Inmate Grievance on December 5, 1986 because the defendant denied him participation in a service on December 2, 1986. On informal resolution on December 11, 1986, Deputy Dunn made the following initial decision:

> All inmates are *encouraged* to attend any religious service, study or program. If Mr. Phelps wants to lead in a service by speaking, singing, et cetera, this is not acceptable because of his admitted homosexual activity. The other men attending the services support the position taken by the volunteer chaplain.

The Grievance Committee recommended that the plaintiff should not be allowed a "leadership role" if that was causing "disruption which is damaging the overall [chapel] program;" but that "if it is only a minority of two residents objecting to Mr. Phelps' leadership role, then he should be allowed full participation." On appeal to Warden Dewey Sowders, the warden modified the committee's recommendation, stating:

> I do not agree with the philosophy that only certain inmates should be permitted roles in chapel activities. All inmates should be afforded the opportunity to participate in leadership roles regardless of sexual preference.

Warden's Decision of January 13, 1987. The plaintiff did not appeal this favorable decision.

The plaintiff asserts that despite the warden's decision, plaintiff was never allowed to participate in services or even enter the chapel. He further alleges that he was subjected to continuous harassment by write-ups following on the heels of the warden's decision. It is plaintiff's position that both defendants Edwards and Dunn failed to abide by and enforce the warden's grievance decision issued in January of 1987.

On May 1, 1987, NTC regulation 23–01–01, which was previously silent on the question of *who* should conduct religious services, was amended to provide that "[i]nmates will not conduct religious services, i.e., preach, lead music, etc."

## THE MAGISTRATE'S REPORT

The Magistrate reached the following conclusions of law. First he considered *sua sponte* whether the defendants are "state actors" for section 1983 purposes. He found that the challenged action taken by defendant Edwards, a volunteer chaplain, was based upon religious doctrine, and not upon any state or prison regulation. Specifically, despite the agreement he had with NTC to conduct religious services, while performing his ministerial duties of interpreting and preaching the words of the Bible, he retained the essential attrib-

---

**2.** Chaplain Polk stated in his affidavit that the plaintiff continued to attend and participate ac- tively in services he, that is, Polk, conducted through early 1987.

utes of a chaplain performing religious services in a non-prison setting. To this extent the defendant was acting independent of the state, and in view of the Establishment Clause of the First Amendment, the state must recognize this independence. Therefore, Edwards cannot be found to have been acting under color of state law. Defendant Dunn, however, was acting under color of state law in his position as deputy warden when he concurred with defendant Edwards' position.

Next the Magistrate considered the plaintiff's First Amendment claims that he was refused the right to attend religious services and the right to take a "leadership role" in the conducting of said services. The Magistrate found that the record clearly reflects that plaintiff was never denied the right to attend any services, nor was he denied the right to participate as a member of the congregation in any religious service. Furthermore, plaintiff's alleged right to assume a leadership role in the conducting of services by singing solos and praising Jesus Christ as an individual separate and apart from the congregation, was found not to be a protected constitutional right. The Magistrate recommended that the First Amendment claim be dismissed with prejudice.

The Magistrate recommended that the Equal Protection claim also be dismissed with prejudice. Recognizing the plaintiff's right under the Fourteenth Amendment to equal protection under the law, he found that there was no prison policy precluding inmates from taking a leadership role in the conducting of religious services, that the decision was left to the discretion of the chaplains. The Magistrate found that the record reasonably supported a conclusion that the plaintiff was being denied the opportunity to take a leadership role in conducting services, while others were being permitted to do so. Although defendant Edwards based his decision to restrict plaintiff's participation on religious grounds, the defendant Dunn relied on his concern for prison security.

The propriety of Dunn's actions are to be measured by whether they are reasonably related to a legitimate penological interest. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). The Magistrate rejected the plaintiff's contention that the defendant's decision was based solely upon the fact that plaintiff was a homosexual. He reviewed the record of growing tension toward the plaintiff by other inmates for reasons of the plaintiff's homosexuality, as well as his monopolizing the allotted time for religious services by his songs and testimony. The Magistrate found that on December 2, 1986, defendant Edwards refused to let any inmate take a leadership role during the service because of his concern for security. Additional security officers attended that service because of rumors of trouble. Defendant Dunn decided to prohibit the plaintiff from taking a leadership role in the conducting of subsequent religious services.

The Magistrate concluded that Dunn's action was not motivated solely by the fact that the plaintiff was a homosexual. Rather he found that the product of two factors, that plaintiff is a homosexual and that other inmates believed that homosexuals should not take a leadership role in conducting services, was a growing discontentment among other chapel participants. The Magistrate found that this discontentment had reached a point sufficient to constitute a security problem, and further, that the record supports Dunn's decision on this basis to bar the plaintiff from a leadership role was reasonably related to the penologial interests of security and rehabilitation of inmates by providing religious programs for the inmates as a whole.

Finally, the Magistrate rejected the plaintiff's alleged violations of the Cruel and Unusual Punishment of the Eighth Amendment and the Due Process Clause of the Fifth Amendment, finding both arguments to be without merit. In a finding related to the due process claim, the Magistrate determined that the May 1, 1987 amendment to NTC regulation 23–01–01 is not at issue as all of the incidents in this action occurred prior to May 1, 1987.

## PLAINTIFF'S OBJECTIONS

The plaintiff objects to 27 itemized findings and conclusions in the Magistrate's report. He presents arguments on allegations of error in five significant areas. The Court will address the five arguments, which incorporate the relevant specific objections.

### I.

First, the plaintiff contends that the Magistrate erred in finding that defendant Edwards was not acting under color of state law. Unlike outside ministers who provide visits and services of particular faiths to ensure that the religious needs of all inmates are met, volunteer chaplains enter into an agreement with NTC to treat all inmates equally and abide by prison regulations. Chaplain Edwards' "Conditions of Employment/Volunteers Services" agreement is attached as an exhibit, in which the defendant acknowledged reading and agreeing to the following:

9. The Institution, its employees and agents have a duty to protect the rights of inmates which are mandated by the Federal and State Constitutions. Therefore, you have a responsibility to:
a. Familiarize yourself with the policies and procedures for disciplining inmates.
b. Comply with the policies and procedures set forth in the Northpoint Training Center's Standard Operating Procedures.

Pursuant to NTC regulation 14–03–01, effective December 19, 1986, inmates enjoy the following rights and responsibilities:

10. The right to be free from discrimination based on race, religion, nationality, sex, handicap or political belief. The responsibility not to discriminate against other inmates or staff for the same reasons.

. . . .

19. The constitutional right to practice religion, subject only to the limitations necessary to maintain institutional order and security. The responsibility not to inflict religious beliefs on others.

NTC regulation 23–01–01, as it was in effect October 22, 1986 through April, 1987, concerns religious services and addresses chaplaincy services, scheduling of services, staffing religious programs, and other related issues. The stated purpose of the regulation is as follows:

To ensure the constitutional right of inmates to practice their religion, subject only to the limitations necessary to maintain institutional order and security, the following procedures are established.

The plaintiff argues that Edwards waived his First Amendment theological objections to homosexuals when he agreed to abide by the state prison regulations in order to serve as a state designated volunteer chaplain. He states that "only a few select ministers are granted the privilege of becoming state designated 'volunteer chaplains' with full authority to act as *the* prison chaplain when the paid chaplain is absent. The position of 'volunteer chaplains' such as Edwards had obtained entitles the Chaplain to have the full authority of the state to order the lock-up or write-up of an inmate during religious programs. Other private ministers coming onto prison grounds do not have and are not clothed with such legal authority." The plaintiff does not refer the Court to NTC's policies and procedures manual in support of these contentions. Rather, they are supported by the plaintiff's sworn statement.

Plaintiff concludes that defendant Edwards is estopped from claiming that his personal theological views require him to violate prison regulations regarding equality of inmate treatment. By relying on his theological beliefs to bar plaintiff from services, he has deprived plaintiff of his constitutional rights.

The Court does not agree with the plaintiff's contention that the Magistrate erred in his finding with regard to defendant Edwards. The question of whether the defendant was acting under color of state law is moot, however, in view of the ultimate conclusion reached by the undersigned.

### II.

Next, the plaintiff asserts that the Magistrate's conclusion that a security risk ex-

ists, or existed, is erroneous. He contends that the Magistrate failed to indicate with specificity the nature of the security risk. The plaintiff has, by affidavit, provided additional evidence that he personally never posed a security risk, which he maintains is sufficient to create a question of fact on the question. He states that the defendants have produced no documents or write-ups suggesting that he is a security risk.

He also contends that defendant Dunn only thought maybe something would happen. Defendant Dunn stated in his sworn statement that he had been told there would be a confrontation at the chapel service on December 2, 1986. When asked whether he had been told that plaintiff was going to instigate a problem or that others would, he responded:

> I honestly don't remember now—how it was going to work. It was the same problem for me securitywise either way. There was going to be a confrontation. So, whether Paul was going to cause a problem or others were going to cause problems because of Paul, it was still a security concern that I had.

Sworn Statement of Wayne Dunn taken October 2, 1990, at p. 12. Defendant also stated that he followed policy in trying to maintain normal activity, watching for problems, and putting on additional security, which is what was done for the December 2nd service. *Id.* at 13.

Plaintiff also relies upon the sworn statement of Captain Sims that the plaintiff was not a security risk, and that he knew of no physical altercations between the two factions. When asked whether he considered Paul Phelps and his alleged group to be a security threat, Captain Sims answered:

> Well, I would consider any group on the yard that formed a nucleus with a leader to be a concern. I would call it a **security concern** more than a threat. I don't think it would evolve into a threat until you saw more of a power base there, but any—any group of more than two or three inmates that shows me that they've got a leader or somebody that

they're looking up to or following causes my concern.

Sworn Statement of Captain Alan Sims taken on August 21, 1990 at p. 33.

Plaintiff asserts that even if he was a security risk on one occasion, no one incident should bar him from chapel services. Furthermore, the complaint in this case concerns an on-going pattern of activity on behalf of the defendants, not a single incident.

Plaintiff concludes that at the very least, a triable factual issue has been presented on the question of whether defendant Dunn's actions were justified by his belief that a security threat existed.

### III.

Plaintiff also argues that even if the defendants could provide evidence that plaintiff actually posed a security risk, they are estopped from doing so because the final grievance decision from Warden Sowders indicates that plaintiff is not a security risk. Warden Sowders overruled defendant Dunn's intermediate decision, which hypothetically raised the question whether plaintiff was a security issue, when he decided that "all inmates should be afforded the opportunity to participate in leadership roles regardless of sexual preference." There was no appeal of this decision.

Plaintiff argues that the Magistrate erred in relying upon Dunn's intermediate decision that the plaintiff posed a security risk, as well as the Grievance Committee's recommendation, which was modified by the warden. Implicit in Warden Sowders' final ruling, made according to the formal inmate grievance procedures, is a finding that plaintiff was not a security threat, because if he had created a security threat, the plaintiff would not have won his grievance.

### IV.

In his fourth argument the plaintiff contends that the Magistrate erroneously defined several critical terms, to the plaintiff's prejudice. In his report, the Magistrate defined and distinguished between the terms "leadership role," "participate,"

and "attend." He characterized the plaintiff's complaint as being a claim that his constitutional rights were violated when he was prohibited from assuming a "leadership role," by performing music, reading scripture, and giving personal testimony. *See* Report at p. 2. The Magistrate used the word "participate" to mean participate in the sense of assuming a leadership role, as distinguished from participating as a member of the congregation who "attends" a service. The plaintiff asserts that he does not allege he was denied a "leadership role," but that he was denied the equal participation in services to which all inmates are entitled. Furthermore, the Magistrate's conclusion that plaintiff was not allowed to "lead," but was permitted to "participate," effectively determined a factual question as to what "participation" entails.

## V.

In his final argument the plaintiff contends that the Magistrate erred by concluding the plaintiff has not adduced *enough* evidence to survive a summary judgment motion, that he ignored the affidavits of Chaplain Polk and Plaintiff Phelps, and that he improperly weighed *conflicting* evidence.

## CONCLUSION

■ A grant of summary judgment should be sustained if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Canderm Pharmacal Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988). The moving party satisfies this burden by " 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the party opposing the motion "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A court decid-

ing a motion for summary judgment must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]...." *Id.* at 252, 106 S.Ct. at 2512.

■ The Court does not concur with the plaintiff in his claim that the Magistrate erred in his review of the evidence for the following reasons. The evidence did not present a sufficient disagreement on facts underlying the Magistrate's critical conclusion that discontentment among chapel participants had reached the point of constituting a security problem. Warden Sowders' decision notwithstanding, defendant Dunn's decision, under the circumstances, to bar plaintiff from a leadership role was reasonably related to the penological interests of security and rehabilitation of inmates by providing religious programs for the inmates as a whole. No order of a warden is immune from review by an Article III judge. The undersigned is of the opinion that Warden Sowders' decision is arbitrary and capricious in view of the very rights relied upon by the plaintiff in asserting his claims.

NTC regulation 14–03–01 guaranteed inmates the following previously recited rights:

10. The right to be free from discrimination based on race, religion, nationality, sex, handicap or political belief. The responsibility not to discriminate against other inmates or staff for the same reasons.

. . . .

19. The constitutional right to practice religion, subject only to the limitations necessary to maintain institutional order and security. The responsibility not to inflict religious beliefs on others.

The warden's decision ignored the rights of other inmate chapel participants to worship without an objectionable disruption.

From the Court's review of the record, the undersigned must concur with the Magistrate's conclusion that chapel discord had escalated to the point of creating a security risk by early December 1986. Plaintiff's assertion that he did not personally pose a security risk is a red herring. Defendant Dunn was addressing a situation which was becoming increasingly volatile not only because of the plaintiff's conduct, but also because of others' reaction to that conduct. Furthermore, the fact that Dunn "only thought something would happen" is precisely the type of *risk* to security that prison officials are expected to prevent when they have a reasonable basis for their beliefs. The need to maintain institutional security is not served by reacting only to security problems in full bloom.

By imposing limits "necessary to maintain institutional order and security," *id.* ¶ 19, defendant Dunn did not deprive the plaintiff of his right to practice his religion. If the plaintiff's free exercise of his religious beliefs required him to regularly project himself to the forefront of chapel services, perhaps the institution would have been advised to allow those supporting plaintiff's method of participation to schedule separate services which would allow that group to worship in ways consistent with their personal religious beliefs. Such an arrangement would not deprive others of their equally protected right to worship without being exposed to offensive conduct.

History is replete with instances of prolonged conflict and bloodshed over the desire of people to worship with a group of kindred mind. The episode which the record in this case reveals is but another example of the potential for conflict which is created by passionately held religious beliefs. In this case, the warden lacked the courage to confront squarely the situation before him and to take the steps necessary to assure all inmates' right to practice religion while maintaining institutional order and security. Instead, he chose merely to grease the squeaky wheel.

As to the definitions employed by the Magistrate, the Court will not be lured into presiding over a battle of semantics when the evidence paints so clear a picture of the nature of the plaintiff's "participation."

Although the Court will adopt the report and recommendation of the Magistrate, the Court will decline to certify that this action is frivolous and was therefore, not brought in good faith. For purposes of 28 U.S.C. § 1915(a), an appeal may be taken from this judgment in forma pauperis. The court being sufficiently advised;

Accordingly,

IT IS THEREFORE ORDERED:

(1) that the Magistrate's report and recommendation be and hereby is adopted as and for the opinion of the Court;

(2) that in conformity with the recommendation, and for the reasons stated herein, the motion of the defendants' for summary judgment be and hereby is SUSTAINED;

(3) that the motion of the plaintiff for pre-trial conference and to set a trial date be and hereby is OVERRULED;

(4) that this action shall be STRICKEN from the docket;

(5) that this is a final and appealable order;

(6) that the Court declines to certify that an appeal would not be taken in good faith for purposes of 28 U.S.C. § 1915(a);